## WILLIAM PALMER V. STATE

No. A-1217.    Opinion Filed July 13, 1912.

(124 Pac. 928.)

RAPE—Evidence—Sufficiency.  Where the testimony of the prosecuting witness is self-contradictory and was obtained through fear, threats, coercion, or duress, and where such testimony is not corroborated by other material evidence as to the commission of the offense, coming from an unquestioned source, a conviction for rape will not be sustained.

(Syllabus by the Court.)

*Appeal from District Court, Caddo County;*
*Frank M. Bailey, Judge.*

William Palmer was convicted of the crime of rape, and appeals.   Reversed and remanded.

*Robinson & Johnson,* for appellant.

*Charles West,* Atty. Gen., for the State.

FURMAN, P. J.   A number of questions are presented by the brief of the counsel for appellant; but, owing to the disposition which we think should be made of the case, it is only necessary to discuss one question, and that is the sufficiency of the evidence.

When the prosecuting witness, Lucile Jackson, was upon the stand, she was examined through an interpreter, and testified that she was a Kiowa Indian; that appellant, William Palmer, married one of her sisters.   She further testified as follows:

"Q. About a month ago didn't William Palmer come to the camp where you were and get you to get out of bed and go with him? A. No, sir.   Mr. Morris:   I would like to have her mother brought in here.   These people have been influencing and

intimidating this girl, and if her mother is present I think she will tell the truth about it."

The mother of the girl was brought into court and remained in the courtroom. The examination of the witness then proceeded, as follows:

"Q. Go ahead now, and tell the interpreter, in the presence of the jury, just where William Palmer got you and where he took you to? A. She says the way I got started to going with him—late in the evening? Q. Was it after dark or before dark? A. Just getting dark. We was getting supper. I was getting out the dishes for supper. I was already engaged with him to go out somewhere."

She said she asked him if he would take her to his mother's house, and he said he could not take her to his mother's house, as he was horseback; and she went to the house and got her clothes and shawl and went back to him, and they went to some oak trees, "and we stood there and talked together awhile, and then went to Mr. Zumalt's house, and then we talked awhile there; not in the house, but close to the house, and talked while there together"; and then he said for her to go home, and she went home, and when she got there it was late at night, and her mother whipped her. She was mad.—

"When he took you out in the timber and you sat down. the first time, did he have you lie down and get on you? A. No. Q. He got on top of you out there in the timber where you stopped, got on top of you? William Palmer, when he took you out in the timber that night, he had you lay down and he got on top of you, didn't he: Mr. Robinson: Objected to as leading. By the Court: It seems to be necessary in order to get any answers. Q. William Palmer can't hurt you a bit in the world. You told your mother, when you went back to the tent, what he had done. You told your mother that Will got on you, and she whipped you for it, didn't she? Will Palmer had you lie down when you got out in the timber, didn't he, Lucile? When you got out in the timber and sat down and talked awhile, that night, you and Will Palmer were out there in the timber together—are you afraid to answer it? Afraid Will will hurt you? A. No, sir. Q. Did you and Will sit down in the timber that night? (Witness hesitated a minute or two between each question.) A. Yes, sir. Q. And while you were sitting there he had you lay down, and he got on top of you, didn't he? Explain to her Mr. Interpreter, that she

won't be hurt, and that she must tell the truth about it.   A. She says they did not lay down together; that they talked a long time there together.   Mr. Morris: I ask that this witness be sent to jail until she will testify and tell the truth.    It has not been fifteen minutes since I talked to this witness and she told me the truth about it.   By the Court: I suggest that you take witness in the room there and talk to her again.   (Whereupon the witness is carried into adjoining room and is consulted with by the county attorney. Being brought back and placed on the witness stand.   Continuing then as follows:)   Q. Now, Lucile, you and Will Palmer went out and sat down together, by some oak trees that night he took you out?   A. Yes, sir.   Q. And while you were sitting there by the oak trees he laid you down?   A. Yes, sir. Q. And got on you? A. Yes, sir.   Q. Put his person into your person, too, didn't he? A. Yes, sir.   Q. And after you got through, then did you get up? A. Yes, sir.   Q. How long did you stay there?   A. I don't know how long.   Q. Did you hear your mother calling you when you were there?   A. Yes, sir.   Q. What did you do when you heard her calling you?   A. Went back home.   Q. Who took you home? Did William Palmer go back home with you on his horse?   A. Yes, sir.   Q. Did he take you clear home, or drop you before you got there?   A. He took me back home.   Q. How close to your home did he get with you?.  Did he go into the camp with you? A. No, sir; he stopped a little ways away.   Q. Do you know where he went then?   A. No, sir.   Q. You are not his wife, are you? A. No, sir.   Q. Your sister is his wife?   A. Yes, sir.   Q. You say you don't know how old you are? A. No, sir."

On cross-examination said witness testified as follows:

"Q. What did Mr. Morris say to you when he took you in that room there awhile ago? A. He asked me what to do with my sister's husband. Q. Didn't he tell you when he went back there that you need not be afraid to go ahead and tell it on Bill? A. Yes, sir. Q. Didn't he tell you that you had made a complaint in the county court about this matter, and that you must swear here what you swore there? A. Yes.   Q. Didn't he tell you in that room there a short time ago that, if you did not swear to here what you swore to in that complaint in the county court, you would be guilty of perjury and would be punished for it?   A. Yes, sir. *  *  *   Q. Didn't you state on last Saturday, in this room, in the law office of Robinson & Johnson, in the presence of Mr. Charles Canon, Arch Stroud, and Berthan Jackson, C. R. Johnson, and R. K. Robertson that your mother was the cause of you coming and making a complaint and had you to swear falsely

about this matter? A. Yes, sir, I said that. Q. Was that true or not? Mr. Morris: Objected to as calling for a conclusion of the witness; it is for the jury to determine. By the Court: Overruled. Q. Was that true or not? A. Yes, sir; I told the truth. Q. Ask her if she did not also state, at the same time and place, and in the presence and hearing of the same parties I have just named, that her mother made her come here and make the complaint? A. Yes. Q. Is that true; that your mother forced you to make this complaint? A. Yes."

The witnesses in this case, with one exception, were Mexican and Indians. Their testimony as a whole is a vague and confused mess, relating to many immaterial matters. There is not one word of testimony in the record which in any manner tends to prove that the appellant is guilty of the offense of which he was convicted, except the evidence of the prosecuting witness. We are not unmindful of the difficulties which arise in the prosecution of such cases as this, and, where the testimony of the prosecuting witness is consistent in its details and free from suspicion of being manufactured or of being influenced by improper motives, we would not disturb the verdict of a jury simply upon the ground that her testimony was not corroborated. The settled rule of this court is that, where there is any evidence in the case from which the jury could reasonably believe that the defendant is guilty of the offense of which he has been convicted, their verdict will not be disturbed on the ground of the insufficiency of the evidence. We do not think that this case comes within this rule. In the first place, this young woman when placed upon the witness stand positively denied that appellant had been guilty of any improper conduct with her. The prosecuting attorney requested the court to send her to jail until she would testify according to statements which she had previously made to him. The prosecuting attorney was then permitted to take the witness into an adjoining room. Upon her return to the courtroom she affirmatively answered the questions asked her. On cross-examination she stated that she was informed in this room that, unless she swore on the witness stand to what she had testified to in her complaint in the county court, she would be guilty of perjury and would be punished for it. So it appears

from the record that her testimony was obtained through threats, fear, coercion, and duress. We do not believe that any man should be deprived of his liberty on such testimony as this, unless it is corroborated by other material testimony coming from an unquestioned source. It is true that appellant is only a poor ignorant Indian, and it is possible he may be guilty of this offense; but we cannot understand how a jury could reasonably find from the evidence in this case beyond a reasonable doubt that he was guilty. We are aware of the horror and detestation with which all good men look upon the crime of rape, and we think that this had more to do with the conviction of appellant than the testimony in the record. The enormity of the crime with which a defendant is charged should never be allowed to supply a want of credible testimony to support such accusation. Courts and juries should act alone upon testimony, and not upon sympathy or prejudice. In fact, the more our sympathies and prejudices are aroused, the more careful we should be in considering the testimony in a case. We believe that it would be an exceedingly dangerous precedent to allow a conviction to stand based upon the testimony in this record. This court is far more interested in the administration of justice than we are in maintaining technical regularity.

The judgment of the lower court is reversed, and the cause is remanded for a new trial.

ARMSTRONG and DOYLE, JJ., concur.