CHESTER HOWARD v. STATE.

No. A-10323.  Dec. 6, 1944.

(153 P. 2d 831.)

248

A. O. Manning, of Fairview, and Kathryn Van Leuven, of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for defendant in error.

JONES, P. J.   The defendant, Chester Howard, was charged in the district court of Grant county with the crime of attempted rape; was tried, convicted of assault and battery with the punishment left to the court; the defendant was thereupon sentenced to serve 30 days in the county jail and pay a fine of $100 and costs, and has appealed.

Several assignments of error are presented in defendant's brief, but it is only necessary to consider the ques-

tion which is raised as to the sufficiency of the evidence to sustain the conviction.

The prosecutrix, Inez Howard, lived at Walters, Okla. She had formerly been married to Gerald Ledbetter. On January 15, 1941, she was divorced from Ledbetter. Subsequently, she met Wayman Howard, son of the defendant, who was working at Lawton. The defendant, Chester Howard, lived on a farm about 14 miles west of Pond Creek, in Grant county. On May 13, 1941, the prosecutrix and Wayman Howard left Walters and drove to Wellington, Kan., where they were married. As they were returning from Wellington, Kan., Wayman Howard was arrested in the town of Pond Creek about dark and incarcerated in the county jail, at Medford, for allegedly giving a hot check.

The alleged attempted rape occurred later that night on a trip by the prosecutrix with the defendant, her father-in-law, in his car from Pond Creek to Medford.

The prosecutrix testified that after Wayman Howard was arrested, she went to York's Laundry to spend the evening with the Gibsons and Juanita York. That Floyd Gibson notified the defendant that his son was in jail, and about 9:30 p. m. the defendant came to York's Laundry and talked to the prosecutrix about the charge filed against Wayman Howard. This was the first time that the prosecutrix and the defendant had ever met. That about 1:30 a. m., she received a telephone call from the defendant in which he asked her to meet him at the back of the laundry; that she had retired for the evening at that time and was sleeping in a thin pair of pajamas which she had borrowed from Juanita York; that she slipped a robe over the pajamas and met the defendant at the rear of the laundry; that defendant suggested that they go to see

Wayman Howard in the jail as Wayman wanted to see the prosecutrix; that she then got into the car with the defendant without putting on any additional clothes and purportedly started for Medford; that the defendant started telling her dirty jokes and about the things he used to do when he was a doctor; that about one mile from Pond Creek the defendant stopped his car and tried to put his arm around her and kiss her; that they only stayed for a few minutes and at her request they drove on to Medford to see Wayman; that they arrived at Medford and drove around the courthouse twice but did not stop; that they then drove out west of Pond Creek and stopped the car; that the defendant wrestled with her and tried to take her robe and pajamas off; that he had hold of both of her wrists; that they struggled until after 6 o'clock in the morning, or from about 2:30 until 6:30; that they were struggling during this entire period of time; that during this entire period the defendant did not kiss her and did not mention committing an act of sexual intercourse with her. The prosecutrix was about 24 years of age. Her husband was released from the jail about 2:30 the next afternoon and they returned to Walters; that the prosecutrix and Wayman Howard separated after living together about 18 days and that she received an annulment of her marriage to Wayman Howard in December of 1941. No complaint was made against the defendant for over two months after the alleged assault occurred.

The defendant testified that after he had met the prosecutrix about 9:30 p. m., he drove with Mr. Gibson to see the county attorney to ascertain the seriousness of the charges against his son; that they had to wait quite a while before they could see the county attorney; that the county attorney advised them that it would take about $50 to straighten out the charges against Wayman; that

after they talked to the county attorney they drove back to the laundry to advise the prosecutrix, Inez Howard, and to see whether Wayman Howard had the money to take care of disposing of the charges filed against him; that they drove behind the laundry and Floyd Gibson called Inez to the door; that Gibson left when Inez Howard came to the car; that defendant advised prosecutrix that it would take about $50 to take care of the charges; that prosecutrix said she could get the money by wiring to Wayman's boss; that prosecutrix then said, "Take me up to Medford," and he remonstrated that it was too late to go as it would not do any good to go up there at such an hour, and that prosecutrix said, "Well, I'll get to see where my Honey is"; that after some argument, he finally agreed to drive her to Medford; that the car was never stopped between Pond Creek and Medford, and that when they arrived at Medford, they drove to the jail and around the courthouse twice, but never did stop; that as he started to leave town, the prosecutrix reached over and got hold of the steering wheel and said, "Let's go around and around again"; that it was about 22 or 23 miles from Pond Creek to Medford, and that after they had circled the courthouse again, he drove to Pond Creek without stopping and let the prosecutrix out at the laundry about 2 a. m., and did not see her again until the time of the preliminary hearing several months later. The defendant specifically denied that he ever attempted to commit an act of sexual intercourse with the prosecutrix or that he ever tried to kiss her or put his arm around her or to do any of the things testified to by the prosecutrix. That he was back at his home in bed by 2:30 in the morning. The defendant further testified to refute certain statements of the prosecutrix concerning his holding her, that he had a deformed wrist and

hand, and he allowed the jurors to feel of his hand to show that there was no strength or grip in the hand. He further testified that he had had an automobile accident in which he had been seriously injured and that three or four vertebrae in his back had been misplaced and deformed by reason of that accident to where he did not have any physical strength, and he further described other physical ailments to show that it would have been impossible for him, if he had so desired, to have committed the sexual act.

The wife of the defendant corroborated his testimony as to his physical condition, and further stated that he arrived back home about 2:30 a. m.; that she was waiting for him to return as she was very anxious to know just what had happened to her son and all of the particulars of the charges against him. She further said that because of the physical disability which he had sustained as a result of the car wreck that he was unable to stoop or turn side-ways.

Another son of the defendant, Jimmy Howard, testified that he was working in Lawton at the time of the marriage of his brother to the prosecutrix; that about September 24, 1941, subsequent to the filing of the charges against his father, the prosecutrix sent word for him to come to Walters to see her; that he drove over to Walters and the prosecutrix told him that she would like to settle the case out of court and that she would settle it if the defendant would pay her $100.

This court in a long line of cases has established the rule that in any rape case where the testimony of the prosecutrix bears upon its face inherent evidence of improbability, is contradictory, inconsistent or unreasonable, it must be corroborated to the extent of making it

sufficient. Maxwell v. State, 78 Okla. Cr. 328, 148 P. 2d 214; Alcorn v. State, 70 Okla. Cr. 386, 106 P. 2d 838; Williams v. State, 61 Okla. Cr. 396, 68 P. 2d 530; Weston v. State, 77 Okla. Cr. 51, 138 P. 2d 553, 554.

In Weston v. State, supra, it is stated:

"The doctrine that one may be convicted on the uncorroborated testimony of the prosecutrix has an exception to the rule that is as well founded as the rule itself, and that is that where her testimony is contradictory, uncertain, improbable or she has been impeached, her testimony should then be corroborated. And this corroboration should be of such dignity as to give it weight with the jury upon the question that the actual crime has been committed. It should not be such slight circumstances as to leave the court and jury to guess or speculate that the crime has been committed and that the defendant is guilty."

It is only necessary to point out a few of the statements made in the examination of the prosecutrix to show the contradictory and uncertain nature of her testimony. As to her divorce from her first husband, she testified positively on direct examination that she received a divorce from Ledbetter in January of 1939; then, later, she testified:

"Q. Was it more than six months after the divorce from Gerald Ledbetter that you married Wayman Howard? A. Yes, sir."

On cross-examination by counsel for defendant, she reiterated that she received her divorce in January of 1939, but after some questioning, she said that it was in January of 1940, as shown by the following.

"Q. Well, when was it? A. It was January in 1940. Q. January, 1940? A. Yes, sir. Q. And when were you and Gerald married? A. January 8, 1939. Q. You lived

with him, then, practically a year before you divorced him? A. That is right. Q. And of that marriage there was one child, was there not? A. That is right. Q. Now, how long had you known Wayman? A. About three months. Q. About three months? Where did you meet him? A. Walters. . . . Q. Now, you say you were divorced at Duncan? A. Yes, sir. Q. In January of 1940? Are you sure it wasn't January 15, 1941? A. I am positive of that."

To refute this positive testimony of the prosecutrix, there was introduced in evidence a certified copy of the decree of divorce granted to the prosecutrix from Gerald Ledbetter in the district court of Stephens county, on January 15, 1941, just two days less than four months before her marriage to Wayman Howard. There was also testimony to show that prosecutrix and Wayman Howard had driven through several county seat towns to Wellington, Kan., to be married because they knew that six months had not expired from the time of her divorce from Ledbetter, and they thought by marrying in Kansas they would not be violating any law.

The long lapse of time before prosecutrix reported the alleged misconduct of defendant, the fact that the pajamas which were exhibited to the jury and shown to be made of very flimsy material were not torn on the particular occasion, would seem to refute her statement that the defendant had pulled and tugged at her pajamas trying to take them off of her.

Furthermore, it was undisputed that subsequent to the filing of the complaint against defendant, the prosecutrix sent for one of the sons of defendant and offered to get the prosecution dismissed upon payment to her of the sum of $100. The testimony of prosecutrix is full of contradictions and inconsistencies. The above portion

relating to her testimony concerning her divorce from her first husband is just a fair sample. Also, the physical condition of the defendant and other physical facts refuted the story told by the prosecutrix.

This is one of those cases where the conviction should not be allowed to stand. It does not reach the plane of honesty and truthfulness which should characterize a prosecution. There was some attempt by the state to corroborate the prosecutrix' story by testimony of a girl friend at Walters and prosecutrix' mother that a few days after prosecutrix returned from her marriage to Wayman Howard, they saw marks on her wrists which looked like bruises. But the testimony of these two witnesses, like the testimony of the prosecutrix, was full of contradictions. Each of them admitted that the alleged bruises were not sufficient to cause them to make inquiry of the prosecutrix as to what caused them. The girl friend of prosecutrix testified that she had never seen a bruise before and had never had one, but that the thing which she saw was what she figured a bruise would look like. At the most, the evidence of the state inculpating defendant amounted to no more than strong suspicion.

The judgment of conviction is reversed.

BAREFOOT, J., concurs. DOYLE, J., not participating.